UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
UNITED STATES                 )
                              )
          v.                  )        CRIMINAL NO. 03-10329-PBS
                              )
ANGELO BRANDAO,               )
             Defendant.       )
_____)
```

**MEMORANDUM AND ORDER**

September 8, 2006

Saris, U.S.D.J.

### I.  INTRODUCTION

Defendant Angelo Brandao moves on several grounds for acquittal, or alternatively for a new trial, following his convictions of racketeering, racketeering conspiracy, assault in aid of racketeering, and use of a firearm in relation to a crime of violence.  After hearing and review of the briefs, the motions are **DENIED**.

### II. BACKGROUND

#### A.  Indictment

Defendant Angelo Brandao ("Brandao") was indicted, along with twelve others, for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et. seq.*, related to his alleged membership in a violent street gang known as Stonehurst that operated out of several areas of Massachusetts and Rhode Island.  The government alleged that Stonehurst

constituted a RICO enterprise and that its members shared several common purposes, namely to shoot and kill associates of a rival gang known as Wendover, to shoot and kill members of a rival gang known as Hunt Street, and "to protect and defend its members and associates from acts and threats of violence and to shoot and kill other people with whom members and associates of the enterprise were engaged in violent or drug related disputes."[1] (Superseding indictment at 3.)

More specifically, defendant Brandao was indicted for racketeering ("substantive RICO") under 18 U.S.C. § 1962(c), racketeering conspiracy under 18 U.S.C. § 1962(d), numerous counts of violent crime in aid of racketeering ("VICAR") under 18 U.S.C. § 1959(a) and use of a firearm in relation to a crime of violence under 18 U.S.C. § 924(c).  Brandao was tried with another alleged Stonehurst member, Brima Wurie, who was charged with similar offenses, but was later acquitted of all charges because the jury found he was not a member of the enterprise.

Count One of the indictment charged Defendants with conducting a racketeering enterprise through a pattern of racketeering, in violation of 18 U.S.C. § 1962(c).  Among the racketeering acts charged were Racketeering Acts 15 and 20.  The superseding indictment reads as follows:

---

[1] The government originally alleged a fourth "common purpose" of the enterprise related to selling drugs, but the government abandoned this charge prior to Brandao's trial.

>    Racketeering Act Fifteen - the Murder of Luis Carvalho
>         21. On or about February 17, 2000, **2. BRIMA A.
>    WURIE, a/k/a/ "BJ,"** the defendant herein, willfully,
>    knowingly, and with deliberately premeditated malice
>    aforethought, did shoot with a firearm Luis Carvalho with
>    the intent to murder him, and by such shooting did kill
>    and murder said Luis Carvalho, in violation of
>    Massachusetts General Laws, Chapter 265, Sections 1 and
>    2, and Chapter 274, Section 2.
>
>    Racketeering Act Twenty - the Murder of Dinho Fernandes
>         26.   On or about March 17, 1999, **1. AMANDO B.
>    MONTEIRO, a/k/a "Manny" or "Suega," 5. ANGELO BRANDAO,
>    and 8. LOUIS RODRIGUES**, the defendants herein, willfully
>    and knowingly did conspire to murder Dinho Fernandes, in
>    violation of Massachusetts General Laws, Chapter 265,
>    Sections 1 and 2, and Chapter 274 , Section 7.

(Superseding Indictment at 11, 13-14.)  Although Racketeering Act

20 is captioned "the Murder of Dinho Fernandes," the actual act

charged is conspiracy to murder Dinho Fernandes.

In connection with Count One, Defendant was charged with

three other racketeering acts: Racketeering Act 1, conspiracy to

murder members of a rival gang known as Wendover; Racketeering

Act 10, assault with intent to murder Antonio Dias; and

Racketeering Act 11, assault with intent to murder Alcides

Depina.  Defendant was also charged with Count Two, racketeering

conspiracy; Count Three, conspiracy to murder members of a rival

gang known as Wendover; and Counts Fifteen through Eighteen and

Thirty-three, various counts of committing violent crimes in aid

of racketeering (VICAR) linked to the specific racketeering acts

alleged.

B.  **Factual Background**

When all reasonable inferences are drawn in the light most favorable to the verdict, as they must be on a motion for acquittal, the jury could reasonably have found the following facts based on the evidence introduced at trial.  United States v. Ortiz, 447 F.3d 28, 32 (1st Cir. 2006) (standard for motion for acquittal).  Stonehurst was a street gang in Dorchester, Massachusetts engaged in numerous shootings and at least one murder, aimed primarily at a rival gang called Wendover.  The gangs consisted largely of the members of Cape Verdean community. Augusto Lopes, the government's cooperating witness, was the leader.  Amando Monteiro was Lopes's best friend and a key member of Stonehurst.  Louis Rodrigues was another member of Stonehurst. Lopes was with Monteiro at a gas station where they were working when Monteiro received a call from his cousin Brandao indicating that he had problems in Brockton.  (Trial Tr. 3:64-65.)  While not clear what the spat was, it involved a fight at a local high school which had nothing to do with the Stonehurst/Wendover rivalry.  Brandao was not a member of Stonehurst at the time of the call.

Monteiro and Lopes picked up fellow Stonehurst associate Louis Rodrigues, and drove to Brandao's house in Brockton to help his cousin with his Stonehurst posse.  (Id. at 67-68.)  Brandao then led the others to Hunt Street and pointed out the target,

4

after which he took them back to his house and gave Monteiro a
gun.  (<u>Id.</u> at 71, 75-79.)  Monteiro, Lopes, and Rodrigues drove
back to Hunt Street and gunned down the prey, Fernandes, and two
others, and then returned to Brandao's house where Monteiro went
inside and left the gun.  (<u>Id.</u> at 78-79.)  Fernandes died as a
result of the shooting.

Lopes later saw the gun Monteiro used to shoot Fernandes at
fellow Stonehurst member Jackson Nascimento's house.  Lopes
indicated his concern about the gun's possible linkage to several
shootings.  Nascimento removed the barrel from the gun, and Lopes
threw the gun into a sewer.  (<u>Id.</u> at 80-82.)  The barrel of the
gun was later found in Nascimento's apartment, and the rest of
the gun was found in the sewer where Lopes had told agents he
dropped it.  Ballistician Sgt. Douglas Weddleton reconstructed
the gun and test-fired it.  He testified that, to a reasonable
degree of ballistic certainty, the shell casings recovered from
the scene of the Fernandes shooting "matched" the gun pulled from
the sewer.  (Trial Tr. 11:32-46.)  Captain John Busa
independently examined the shell casings and verified Sgt.
Weddleton's conclusion.  (<u>Id.</u> at 86.)

Brandao's role in the shooting was further corroborated by
the testimony of State Trooper John Duggan and Boston Detective
Mark Reardon.  Duggan and Reardon interviewed Brandao after he
was arrested for the shooting of Alcides Depina, for which

Brandao was also charged in this indictment.  Brandao allegedly was driving a car with Stonehurst member Manny Lopes.  Lopes spotted Depina and exited the car and shot at him, but never connected.  The car was later stopped, and the gun was found in a hide behind the glove compartment.  Brandao was arrested.  State Trooper Duggan began questioning Brandao about the Fernandes homicide.  After first offering an alibi which Duggan knew was untrue, Brandao began to weep.  When Duggan asked Brandao to describe his version of the events surrounding the Fernandes murder.  Brandao responded, "What am I looking at, 25 to life?  I can't do that time.  Even if I tell you what happened I'm still looking at time."  (Trial Tr. 5:138.)  After Duggan told Brandao he knew of Gus Lopes's involvement, Brandao said, "I guess there's nothing left for me to do" and told Duggan someday he would tell him the whole story.  (Id. at 140.)  Although Brandao did not explicitly confess to the crime, these incriminating statements, along with the ballistics evidence, corroborate Lopes's testimony regarding the murder.

Summing up the connection between the Fernandes murder and Brandao's association with Stonehurst, the prosecutor stated in his closing argument:

> What happened here, though?  Angelo Brandao called his cousin, and who came down?  Manny Monteiro, Augusto Lopes, and Louis Rodrigues, three members of Stonehurst, to whom Angelo Brandao gave a gun.  He was enlisting their services.  He was becoming a member.  And after that, he went up to Boston and rode around looking for

> Wendover people with Augusto Lopes and did shootings against enemies of Augusto Lopes and Stonehurst.  That's why this is a racketeering case.

(Trial Tr. 11:118.)

C.  **The Instructions and Convictions**

The Court instructed the jury on February 7, 2006.  The parties were provided with a draft of the instructions over a week before the case went to the jury, and the Court held two charge conferences to discuss the instructions, during which the parties lodged multiple objections.  The jury was provided a redacted copy of the indictment for their deliberations and was required to answer questions on a special verdict form.

The jury instructions with respect to Racketeering Acts 15 and 20, involving the Luis Carvalho and Dinho Fernandes killings, described the charges as "murder on behalf of the enterprise." (Jury Instr. No. 30.)  At no time before the jury was charged was the instruction on these racketeering acts objected to by any party.[2]  As such, the Court instructed the jury on the crime of substantive murder under Massachusetts law, the elements of which are that the defendant committed an unlawful killing, with malice and deliberate premeditation.  The jury was also read an instruction on aiding and abetting stating that a person "may also be guilty of committing a crime if that person aided and

_____

[2] Indeed, most of the debate regarding the jury instructions involved the elements of RICO itself, not the individual racketeering acts.

7

abetted in the commission of the crime." (Jury Instr. No. 31.)
The instruction added that "the government must prove that the
defendant consciously shared the other person's knowledge of the
underlying criminal act and intended to help him."  (Id.)  The
jury was properly instructed on the elements of conspiracy to
murder in connection with Racketeering Act 1 (but not
Racketeering Acts 15 & 20).  (Jury Instr. No. 28.)

On February 9, 2006, the jury convicted Brandao on several
of these charges: substantive RICO, RICO conspiracy, and the
VICAR counts related to the assault of Alcides Depina.  The jury
acquitted Brandao of the VICAR counts related to conspiracy to
murder members of a rival gang known as Wendover, the assault of
Antonio Dias, and the murder of Dinho Fernandes.  With respect to
the substantive RICO conviction, in response to questions on the
special verdict form (Docket No. 1259), the jury found the
government had proven beyond a reasonable doubt that the
enterprise alleged in the indictment both existed and had the
requisite impact on interstate commerce for conviction.  The jury
specifically found that the government had proven that Brandao
was a member of or associated with the enterprise.

The jury also found, in connection with the substantive RICO
count, that Brandao had participated in the conduct of the
enterprise through a pattern of racketeering activity.  In order
to find this, the jury found that the government had proven that

8

Brandao committed two of four racketeering acts alleged against
him.  The jury found that Brandao had committed assault with
intent to murder Alcides Depina and the murder of Dinho
Fernandes.  Furthermore, the jury specifically concluded that
these acts were related to the enterprise.  The jury found that
the government had not proven beyond a reasonable doubt that
Brandao conspired to murder members of a rival gang known as
Wendover or that he assaulted Antonio Dias.

### D.  **Post-Trial Motions**

After trial, Defendant made several post-trial motions.  One
motion focused on the sufficiency of the evidence supporting the
jury's verdict (Docket No. 1275).  Another motion focused on the
government's failure to disclose an additional conviction of its
star witness, former Stonehurst member, Augusto Lopes (Docket No.
1320).  Later, Defendant filed a third motion alleging that the
Court constructively amended the indictment through its jury
instructions (Docket No. 1343).  The third of these motions is by
far the most difficult, and the Court will address it and its
impact first.  The Court will then address the more salient
aspects of the other motions.  To the extent that the Court does
not deal with some arguments presented in Defendant's motions,
with respect to those arguments, the motions are denied.

### III.  DISCUSSION

**A. <u>Constructive Amendment</u>**

Defendant argues that the Court constructively amended the indictment in its instructions to the jury regarding Racketeering Act 20, titled in the indictment as "the Murder of Dinho Fernandes."  The Racketeering Act charged against co-defendant Wurie was similarly titled.  In a manifestation of the old admonition to never judge a book by its title, the racketeering act alleged in the indictment was actually that Brandao, with others, "willfully and knowingly did conspire to murder Dinho Fernandes," citing both the Massachusetts statutes for murder and conspiracy.  (Superseding Indictment at 13.)  In contrast, the charge against Wurie was actually the murder.  (<u>Id.</u> at 11.)  When it drafted the jury instructions, the Court inadvertently drafted the instructions for both defendants based on the Massachusetts murder statute, but did not add a separate conspiracy instruction for Brandao.  The Court also drafted a charge of aiding and abetting under 18 U.S.C. § 2.  It distributed copies of the draft instructions before a week before the jury was to be charged. The Court held <u>two</u> charge conferences, but neither the government nor defense counsel objected to this instruction, although defense counsel objected early and often to other aspects of the draft charge.  Without objection, with respect to Racketeering Act 20, the Court charged the jury on the elements of substantive

10

murder under Massachusetts law.  Mass. Gen. Laws ch. 265, § 1.
The Special Verdict Form submitted to the jury asked, "Has the
government proven beyond a reasonable doubt that defendant
Brandao has committed Racketeering Act Twenty, the murder of
Dinho Fernandes?"  (Docket No. 1259.)  Both parties also had
drafts of the Special Verdict Form well in advance of the case
going to the jury and objected to other aspects of it during the
charge conferences.  On the third day of deliberation, the jury
returned its verdict.  Based on the Court's instructions, the
jury found that the government had proven beyond a reasonable
doubt that Defendant committed the murder of Dinho Fernandes.

Only after the government responded to Defendant's first
post-trial motion for acquittal did Defendant argue that the
Court constructively amended the indictment in the jury
instructions.  Defendant initially moved only for reversal of his
convictions on Counts One and Two (Docket No. 1343).  Later,
however, Defendant later changed tack and moved to dismiss his
convictions on Counts Seventeen and Eighteen on the same grounds
(Docket No. 1350).

### 1.  **Standard of "Review"**

The threshold question is the timeliness of the objection
and the standard in district court for reviewing an untimely
objection in a post-trial motion.  Defendant contends that his
objection is timely because it has been raised in a motion for

acquittal in the trial court.  The government argues that the objection comes too late because it was not made contemporaneously with the charging of the jury.

Federal Rule of Criminal Procedure 30(d) states that, "A party who objects to any portion of the jury instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. . . . Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)."  Rule 52(b) allows review only for plain error.  Objections to jury instructions raised for the first time in the appellate court are therefore reviewable only for plain error.  See United States v. Bailey, 405 F.3d 102, 110 (1st Cir. 2005); United States v. Moran, 393 F.3d 1, 13 (1st Cir. 2004).

Defendant resists this interpretation.  Arguing that plain error review is not an appropriate standard for a district court to apply, he notes that plain error is typically a standard directed at a court of appeals.  See generally United States v. Olano, 507 U.S. 725, 731 (1993).  Moreover, the plain language of Rule 30(d) states that "[f]ailure to object in accordance with this rule precludes *appellate* review."  Fed. R. Crim. P. 30(d) (emphasis added).  However, it is not unprecedented for a trial court to apply the plain error standard to an objection raised

for the first time in a post-trial motion, because at that stage, the court "performs something of an appellate role."  United States v. Washington, 263 F. Supp. 2d 413, 426 n.7 (D. Conn. 2003); see also United States v. Goodlow, 910 F. Supp. 476, 478 (D.S.D. 1995) ("Failure to object to an alleged error generally precludes a defendant from asserting the claimed error," but applying plain error review if defendant is prejudiced) (citing United States v. McBride, 862 F.2d 1316, 1319 (8th Cir. 1988)); United States v. Jones, 404 F. Supp. 529, 539 (E.D. Pa. 1975) ("In the absence of plain error, matters not called to the attention of the trial judge cannot be subsequently raised in the post trial stage of the proceeding.").

Numerous courts dealing with objections to jury instructions in a post-verdict motion for new trial have applied the familiar plain error standard.  See United States v. Johnson, 2006 U.S. Dist. LEXIS 39460, at *17 (D. Del. June 14, 2006) (applying plain error review to jury instruction challenge on motion for acquittal or new trial); United States v. Briner, 2005 U.S. Dist. LEXIS 31573, at *15 (E.D. Pa. Dec. 7, 2005) (noting in ruling on motion for acquittal or new trial, "Since defendants did not object to the jury instruction at trial, the instruction is reviewed for plain error."); United States v. Johnson, 403 F. Supp. 2d 721, 831 (N.D. Iowa 2005) (noting that "when no timely objection is made to preserve the error in the instructions, the

reviewing court will review for plain error"); <u>United States v.</u>
<u>Dayan</u>, 2005 U.S. Dist. LEXIS 5522, at *10-11 (S.D.N.Y. Apr. 5,
2005).

Defendant also suggests that a motion for acquittal pursuant
to Fed. R. Crim. P. 29 is the appropriate time to raise a claim
of constructive amendment, citing caselaw dealing with
constructive amendments based on evidence being admitted at trial
which broadened the charges.  However, Defendant points to no
caselaw dealing with a constructive amendment based on erroneous
jury instructions raised for the first time after the jury has
been charged.  The motivation behind the rule that a party must
object to jury instructions before the jury retires is "to give
the judge one last chance to rectify any error by a correction."
5 Wayne LaFave, Jerold H. Israel & Nancy J. King, <u>Criminal</u>
<u>Procedure</u> § 24.8(b), p. 572 (2d ed. 1999); <u>United States v.</u>
<u>Coady</u>, 809 F.2d 119, 123 (1st Cir. 1987) ("The rule requires that
litigants register their complaints at a time and in a
(sufficiently particularized) manner than enables the trial judge
intelligently to appraise the soundness of the position asserted,
and if need be, correct the charge to avoid injustice."); <u>see</u>
<u>also</u> <u>United States v. Dominguez Benitez</u>, 542 U.S. 74, 82 (2004)
(noting that the plain error "standard should enforce the
policies that underpin Rule 52(b) generally, to encourage timely
objections and reduce wasteful reversals by demanding strenuous

14

exertion to get relief from unpreserved error"). Indeed a rule allowing Defendant to contest the jury instructions for the first time at this stage of the proceedings would create exactly the opposite incentive: to sit on a potent challenge to an instruction until after the verdict.

Defendant makes a spurious, though vehement, argument that the blame for the mis-instruction should rest squarely on the government's shoulders. Rather, Defendant is equally to blame for failing to object at either of the charge conferences despite having a copy of the draft charge well in advance of the jury's retiring. There is no evidence that either the government or the defense acted in bad faith.

As such, the Court will review using the plain error standard. In this circuit, plain error is an extremely tough standard to meet. See Moran, 393 F.3d at 13; United States v. Garcia-Torres, 341 F.3d 61, 66 (1st Cir. 2003). Under the plain error standard, the movant bears the burden of showing that the trial court committed an error, that the error was "plain," and that the error affected his substantial rights. United States v. DeCicco, 439 F.3d 36, 44-45 (1st Cir. 2006). However, even if Defendant satisfies the first three steps of plain error review, the Court is not required to correct the error; rather, it should do so only when the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." Olano,

507 U.S. at 735-36 (internal citation and quotation marks
omitted).  As the First Circuit recently stated, the power to
reverse "should be employed sparingly to correct grave or
consequential errors – those that 'seriously affect the
fundamental fairness and basic integrity of the proceedings
conducted below.'" United States v. Padilla, 415 F.3d 211, 221
(1st Cir. 2005) (en banc) (quoting Griffin, 818 F.2d at 100).

### 2.  **Plain Error in Count One**

The Supreme Court has held that it is "the rule that a court
cannot permit a defendant to be tried on charges that are not
made in the indictment against him." Stirone v. United States,
361 U.S. 212, 217 (1960).  Because the Fifth Amendment "requires
that prosecution be begun by indictment . . . it has been the
rule that after an indictment has been returned its charges may
not be broadened through amendment except by the grand jury
itself." Id. at 215-16.  A constructive amendment "occurs when
the charging terms of an indictment are altered, either literally
or in effect, by prosecution or the court after the grand jury
has last passed upon them." United States v. Fisher, 3 F.3d 456,
462 (1st Cir. 1993) (quoting United States v. Dunn, 758 F.2d 30,
35 (1st Cir. 1985)).  Defendant argues that the jury instructions
constituted a constructive amendment because the racketeering act
charged was conspiracy to murder and the Court instructed the
jury on the elements of substantive murder.  The jury convicted

16

the defendant of that charge.  Defendant further argues that the
mis-instruction infected his other convictions.

As both parties agree, the Court committed plain error in
its instruction on Racketeering Act 20.  The Court instructed the
jury that the Racketeering Act was substantive murder, when the
grand jury had indicted the defendant on a charge of conspiracy
to murder.  The change in the predicate act altered the charging
terms of the indictment and therefore constituted a constructive
amendment.

However, unlike Stirone, Defendant was not charged with an
act not alleged at all in the indictment.  In Stirone itself, the
defendant was indicted for a Hobbs Act violation stemming from
interference with interstate commerce specifically in sand.  At
trial, the government introduced evidence that the defendant also
interfered with interstate commerce in steel, which was not
included in the indictment.  361 U.S. at 213-15.  The Supreme
Court ruled that the indictment was constructively amended and
reversed the conviction.  Id. at 219.  As part of Count Thirty-
three, the VICAR count linked to the murder of Dinho Fernandes,
the indictment charged that Defendant "knowingly, intentionally,
and with deliberately premeditated malice aforethought, murdered
Dinho Fernandes."  (Superseding indictment at 64.)  The jury
acquitted Defendant of that charge even though it convicted him
of the substantive murder of Dinho Fernandes as instructed with

17

respect to Racketeering Act 20.  A likely explanation for the jury's behavior is that there is an additional element of the VICAR count which the government failed to prove, namely that Defendant committed the murder of Fernandes, who was not a Wendover member, in furtherance of his membership in the enterprise or because it was expected of him by reason of his membership in the enterprise or for the purpose of maintaining his position in the enterprise.  The evidence supports the jury's verdict-that Brandao committed the murder, but did not do so to further his membership in the enterprise.  Indeed, his participation in the murder through the manpower of the enterprise, provided the gateway to the enterprise.

   3.  **Prejudice**

      a.  **Does the Defendant Need to Demonstrate Prejudice?**

   The third prong of plain error review places the burden on the defendant to show that the error affected his substantial rights, meaning in most circumstances "the error must have been prejudicial: It must have affected the outcome of the district court proceedings."  Olano, 507 U.S. at 734.  "In other words, the proponent – the party asserting plain error – must show 'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'"  Padilla, 415 F.3d at 221 (quoting Dominguez-Benitez, 542 U.S. at 81-82); United States v. O'Brien, 435 F.3d 36, 40 (1st Cir. 2006) ("Under

18

Olano, it is enough to sustain the conviction that the result would quite likely have been the same" despite the errors).

Defendant argues that under the third prong, prejudice is not required in a case of constructive amendment because in such cases Stirone mandates per se reversal.  See Stirone, 361 U.S. at 219.  In a recent case, the First Circuit stated:  "A constructive amendment is considered prejudicial per se and grounds for reversal of a conviction."  DeCicco, 439 F.3d at 43 (quoting United States v. Fisher, 3 F.3d 456, 462-63 (1st Cir. 1993)); accord Haines v. Risley, 412 F.3d 285, 290 (1st Cir. 2005) (repeating the per se language).   However, in DeCicco, it did not apply this per se language in that case, having found that no constructive amendment occurred.  439 F.3d at 43. Moreover, as the Third Circuit has noted, in Stirone the Supreme Court "reviewed a constructive amendment to which the defendant raised an objection in the district court, and thus does not necessarily extend the per se rule to the plain error context." United States v. Syme, 276 F.3d 131, 152 (3d Cir. 2002) (Becker, C.J.); accord United States v. Remsza, 77 F.3d 1039, 1043 (7th Cir. 1996).

The circuit courts are split on the question of whether a defendant must demonstrate prejudice to achieve reversal based on a constructive amendment under plain error review.  See United States v. Gonzalez Edeza, 359 F.3d 1246, 1251 n.3 (10th Cir.

2004) (noting "a three-way circuit split regarding the proper method to determine whether the alleged constructive amendment affected the defendant's substantial rights"); <u>Syme</u>, 276 F.3d at 152 (noting that "it is uncertain whether this application of the per se rule has survived <u>Olano</u>" and that "the circuits are divided and the resulting law is checkered").

Other circuits considering the issue have divided into several camps.  The Fourth Circuit, in the case upon which Defendant primarily relies, has held that constructive amendments always constitute reversible plain error, holding in a 6-5 en banc opinion that "a constitutional verdict cannot be had on an unindicted offense."  <u>United States v. Floresca</u>, 38 F.3d 706, 712 (4th Cir. 1994) (en banc).  No other circuits have adopted the <u>Floresca</u> approach.  The Second Circuit has held that the prejudice prong of plain error review is per se satisfied.  <u>See</u> <u>United States v. Thomas</u>, 274 F.3d 655, 670 (2d Cir. 2001) (en banc) (holding that requiring the defendant to prove prejudice "would work the harm the Grand Jury Clause is intended to prevent—a federal prosecution begun by arms of the Government without the consent of fellow citizens").  The Fifth and Seventh Circuits have held that normal plain error review applies and the defendant must demonstrate prejudice.  <u>See</u> <u>United States v. Fletcher</u>, 121 F.3d 187, 192-93 (5th Cir. 1997); <u>Remsza</u>, 77 F.3d at 1044.  The Third Circuit has crafted a middle ground, holding

that a rebuttable presumption of prejudice exists when there has been a constructive amendment.  <u>Syme</u>, 276 F.3d at 154.  Other circuits have not yet dealt with the issue head on, but have acknowledged the dilemma.  <u>See</u> <u>Edeza</u>, 359 F.3d at 1251 (noting that because it refused to reverse conviction under the fourth prong of <u>Olano</u>, the Tenth Circuit panel "need not choose sides in a three-way circuit split regarding the proper method to determine whether the alleged constructive amendment affected the defendant's substantial rights"); <u>United States v. Dipentino</u>, 242 F.3d 1090, 1095 (9th Cir. 2001); <u>United States v. Lawton</u>, 995 F.2d 290, 294 (D.C. Cir. 1993) (applying plain error review to constructive amendment, but not reaching question of whether amendment is per se prejudicial).

Under the evolving caselaw in the Supreme Court, it is far from clear that a per se rule is appropriate in constructive amendment cases.  To begin, the Supreme Court has not, despite having had several opportunities, listed constructive amendments among the group of so-called "structural errors" that irrevocably infect a court's proceedings.  <u>See</u> <u>Washington v. Recuenco</u>, 126 S. Ct. 2546, 2551 n.2 (2006) (listing structural errors, but not including constructive amendments or citing <u>Stirone</u>); <u>Johnson v. United States</u>, 520 U.S. 461, 468 (1997) (same); <u>see also</u> <u>Syme</u>, 276 F.3d at 156 n.10 (noting "it is doubtful that constructive amendments are structural errors as the Supreme Court has defined

that category . . . Notably, neither <u>Johnson</u> nor <u>Neder</u> cited

<u>Stirone</u> or listed constructive amendments as one of the narrow

class of structural errors").

The Tenth Circuit, in recently rejecting a per se reversal

rule for constructive amendments, noted that the recent Supreme

Court plain error cases suggest that per se rules are a thing of

the past.[3]   <u>See</u> <u>Edeza</u>, 359 F.3d at 1251 (citing <u>United States v.</u>

<u>Cotton</u>, 535 U.S. 625, 632-33 (2002) (refusing to reverse

conviction on plain error even though indictment failed to allege

drug quantity element of offense)); <u>Johnson</u>, 520 U.S. at 470).

The Supreme Court has explicitly stated, in the context of

prosecutorial misconduct, that,

> A per se approach to plain-error review is flawed.  An
> error, of course, must be more than obvious or readily
> apparent in order to trigger appellate review under
> Federal Rule of Criminal Procedure 52(b).  Following
> decisions such as <u>United States v. Frady</u>, <u>United States
> v. Socony-Vacuum Oil Co.</u>, and <u>United States v. Atkinson</u>,
> federal courts have consistently interpreted the plain-
> error doctrine as requiring an appellate court to find

---

[3] Defendant urges the Court to adopt a standard such that a
"mere possibility" that there was a constructive amendment
mandates reversal, pointing to that language in the First
Circuit's 1985 opinion in <u>United States v. Dunn</u>, 758 F.2d 30, 36
(1st Cir. 1985).  There are, however, two reasons for not
accepting that this is the controlling standard in the First
Circuit.  First, it is unclear from the case whether this
language constitutes part of the court's holding or it is part of
its recapitulation of the defendant's argument.  It is impossible
to tell because the court did not find a constructive error in
that case.  Second, even if the court had intended the "mere
possibility" test to be the rule, that rule's vitality is in
doubt due to the Supreme Court's plain error jurisprudence over
the last twenty years.  <u>See, e.g.</u>, <u>Syme</u>, 276 F.3d at 152.

> that the claimed error not only seriously affected
> "substantial rights," but that it had an unfair
> prejudicial impact on the jury's deliberations.   Only
> then would the court be able to conclude that the error
> undermined the fairness of the trial and contributed to
> a miscarriage of justice.   To do otherwise could well
> lead to having appellate courts indulge in the pointless
> exercise of reviewing "harmless plain errors" -- a
> practice that is contrary to the draftsmen's intention
> behind Rule 52(b), and one that courts have studiously
> avoided and commentators have properly criticized.

United States v. Young, 470 U.S. 1, 16 n.14 (1985) (citations

omitted).

     The Supreme Court itself has limited the Stirone per se rule

by rejecting reversal when a constructive amendment narrows,

rather than broadens, the charge in the original indictment.

United States v. Miller, 471 U.S. 130, 135 (1985) (noting that

"there can be no showing here that Miller was prejudicially

surprised at trial").   The Court's opinion in Miller suggests

that it considered prejudice a critical factor in deciding

whether a particular constructive amendment warranted reversal.

Id. As a concrete matter, the alleged constructive amendment in

this case was not the type of error that mars an entire trial or

renders the proceedings fundamentally unfair, especially given

that neither party even noticed the error, despite having copious

time to scrutinize the jury charge and object to it.   Cf., e.g.,

Vasquez v. Hillery, 474 U.S. 254 (1986) (racial discrimination in

selection of grand jury); Waller v. Georgia, 467 U.S. 39 (1984)

(denial of right to public trial); Tumey v. Ohio, 273 U.S. 510

(1927) (biased trial judge).

As a matter of judicial policy, in my view, the courts which have required that a defendant be prejudiced by a constructive amendment have the better of the argument.  As the Fifth Circuit stated:

> Moreover, to hold that a constructive amendment requires per se reversal even under Olano would encourage the kind of sandbagging that the plain error rule is designed to prevent.  Were we to so hold, no rational defense counsel would ever object to the erroneous instructions in a prosecution similar to this one: not only would the erroneous instruction increase the likelihood of acquittal, but defense counsel would also know a conviction would necessarily be reversed on appeal.  Such a situation does not accord with justice or common sense.

Fletcher, 121 F.3d at 193 (citations omitted); United States v. Reyes, 102 F.3d 1361, 1365-66 (5th Cir. 1996) ("We refuse to reverse a conviction when doing so would create such perverse incentives."); but see Syme, 276 F.3d at 154 n.9 (rejecting sandbagging argument on grounds that "defendants who may be considering a sandbagging strategy still risk that an appellate court will exercise its discretion to refuse to notice plain error if the defendant fails to object to the error at the trial level").  See also Floresca, 38 F.3d at 725 (Russell, J., dissenting) (arguing that the majority's per se rule amounts to "[e]xtolling technicality over fairness").  The Court does not find that such "sandbagging" occurred in this case; rather, all parties made an honest mistake.  However, from an ex ante perspective, the Court is persuaded that the risk of potential

sandbagging justifies rejecting an exception to the normal requirement that a defendant demonstrate prejudice when asserting plain error.  Indeed, allowing such an objection to avoid the strictures of the plain error rule would flout the purposes of the rule.  See Dominguez Benitez, 542 U.S. at 82.  Although the First Circuit has consistently recited a per se rule for constructive amendments, it has not ruled in the context of an untimely objection to a jury instruction.  The caselaw nationwide is in flux, and the Supreme Court jurisprudence suggests a per se rule may no longer be applicable in this area.  As such, I will analyze the issue under both the third and fourth prongs of the plain error standard.

### b.  **Has the Defendant Demonstrated Prejudice?**

If defendant is required to demonstrate prejudice, the Court must assess whether there is a reasonable probability the outcome would have been different but for the error.  Padilla, 415 F.3d at 221.  After review of the trial record, the Court finds that the defendant suffered no actual prejudice as a result of the constructive amendment, and therefore, his motion must be denied. Indeed, Defendant conceded as much at the hearing.  The jury found Brandao guilty beyond a reasonable doubt of the substantive murder of Dinho Fernandes.  The indictment, admittedly, charged Brandao with conspiring to commit that murder.

Substantively, the difference between the instruction for

substantive murder and the instruction for conspiracy would have
been an instruction on the element of "agreement."  The Court
correctly instructed the jury on the elements of conspiracy to
murder in connection with Racketeering Act 1.  The three elements
of conspiracy to murder are: (1) that the defendant joined in an
agreement or plan with one or more persons; (2) that the purpose
of the agreement was to commit murder; and (3) that the defendant
joined the conspiracy knowing of the plan to commit murder and
intended to help carry it out.  (Jury Instr. No. 28.)  As noted
above, the elements of substantive murder are (1) an unlawful
killing; (2) malice; and (3) deliberate premeditation.  (Jury
Instr. No. 30.)  Of course, the jury convicted Defendant of
actually committing the substantive murder.  The theory of the
government's case demonstrates that, had the Court instructed the
jury on the additional element of agreement, there is no
probability the result would have been different.

Brandao simultaneously joined the Stonehurst enterprise when
he recruited its help.  Lopes testified, and ballistics evidence
confirmed, that after joining the enterprise, Brandao
participated with Stonehurst members in their activities, such as
the shooting at Depina.  The prosecutor's unchanging theory of
the murder, elucidated in the closing argument, was that Brandao
combined with others for the specific objective of shooting and
killing Dinho Fernandes, which they successfully carried out.

(Trial Tr. 11:118.)  More specifically, the government alleged that Brandao called Monteiro, who came to Brockton with Lopes and Rodrigues, at which point Brandao pointed out Fernandes and provided Monteiro with the murder weapon.  Because the government never suggested that Defendant pulled the trigger, an agreement was a necessary condition of the jury's finding Defendant guilty of the substantive murder via an aiding and abetting theory.  Although Defendant puts forward alternative theories in his post-trial briefs, there is nothing that suggests that the jury would have decided the case differently if required to find the element of "agreement."

Additionally, in connection with all of the racketeering acts, the jury was correctly charged with respect to aiding and abetting liability.  The elements of aiding and abetting liability are (1) that someone else committed the crime charged; and (2) that the defendant associated himself in some way with the crime and participated in it as he would in something he wished to bring about.  (Jury Instr. No. 31.)  As shown above, there was ample evidence to convict Defendant of the Fernandes murder on a theory of aiding and abetting.  Although one can be convicted of conspiracy without being convicted of aiding and abetting (the crime need not actually ever be committed for conviction of a conspiracy), the reverse could not be true in the circumstances of this case.  Given the proof in this case, there

is no logical explanation for how the jury could have found Brandao guilty of aiding and abetting substantive murder and not guilty of conspiracy to murder.

Defendant argued at the hearing that aiding and abetting should not have been applied to Racketeering Act 20 because it was not specifically alleged in the indictment.  Again, Defendant did not object to this instruction before the jury was charged. More importantly, however, because aiding and abetting is not a separate crime but only a basis for liability for the underlying substantive offense, it need not be charged separately in an indictment.  See United States v. Gonsalves, 435 F.3d 64, 69 (1st Cir. 2006) ("As it happens, aiding and abetting need not be separately charged to support an instruction."); United States v. Keene, 341 F.3d 78, 84 (1st Cir. 2003) ("An instruction on aiding and abetting may be given although there is no reference to the crime in the indictment." (citing United States v. Footman, 215 F.3d 145, 154 (1st Cir. 2000)).

Given the theory of the crime and the evidence presented in support of that theory by the government, there is no likelihood that the jury would not have found Defendant guilty of conspiracy.  At the hearing, Defendant essentially conceded there was no actual prejudice.  Rather, there was overwhelming evidence that Brandao agreed with Monteiro to murder Dinho Fernandes. Therefore, even though Count One was constructively amended, this

28

amendment did not prejudice the defendant and does not warrant
reversal and a new trial.  Rather, this case more closely
resembles cases in which the court inadvertently omits an element
of an offense; those cases, as noted above, are reversed only
when the defendant suffers prejudice.  See Neder v. United
States, 527 U.S. 1, 19 (1999) (requiring the court to determine
"whether the record contains evidence that could rationally lead
to a contrary finding with respect to the omitted element").  In
cases following Neder, both the Supreme Court and First Circuit
have refused to reverse when the record contains very strong
evidence that the jury would still have convicted but for the
error.  See Cotton, 535 U.S. at 632-33 (refusing to reverse on
plain error even though drug quantity increased maximum sentence
but was not alleged in indictment because of "overwhelming"
evidence of the correct drug amount introduced at trial);
Johnson, 520 U.S. at 469-70 (refusing to reverse on plain error
when element of materiality was not introduced to the jury
because evidence was so strong at trial); United States v.
Benjamin, 252 F.3d 1, 9-10 (1st Cir. 2001) (finding that the
record did not contain evidence that would have led a rational
jury to reach a contrary finding on the omitted element).

     Although it is sometimes dangerous to question what a jury
might have done if instructed differently, in light of the
evidence noted above and the facts of this case, there is no

evidence in this record that would have led a rational jury to
conclude that Brandao did not enter into an agreement with others
to murder Dinho Fernandes once they found he committed the
murder.[4]  As such, reversal would not be warranted whether the
Court presumed prejudice in this case or the defendant had to
demonstrate it.

### 4.  __Manifest Injustice__

If the First Circuit concludes that constructive amendments
continue to fall within this small class of "structural errors"
for which proof of prejudice is not required, the Supreme Court
and First Circuit have made clear that even those errors are
subject to the fourth prong of plain error review.  See United
States v. Fazal-Ur-Raheman-Fazal, 355 F.3d 40, 48 n.5 (1st Cir.
2004) (citing Johnson, 520 U.S. at 466).  Under Olano and its
progeny, the fourth prong of plain error review provides that a
court should not exercise its discretion to reverse a conviction,

---

[4] Defendant argues that it is improper to speculate on what a
correctly charged jury would have done, citing the Supreme
Court's language in United States v. Sullivan, 508 U.S. 275, 282
(1993).  Sullivan reversed a conviction based on an incorrect
reasonable doubt instruction which the Court held tainted all of
the jury's findings.  The Court, however, has limited the holding
of Sullivan to its facts in the Neder line of cases,
distinguishing Sullivan on the grounds that the incorrect
instruction in that case tainted all the others.  Omission of an
element of an offense does not similarly infect the rest of the
instructions.  See Recuenco, 126 S. Ct. at 2553 n.4 ("We
recognized in Neder, however, that a broad interpretation of our
language from Sullivan is inconsistent with our case law.").

unless the error "seriously affects the fairness, integrity or public reputation of judicial proceedings."  <u>Olano</u>, 507 U.S. at 732.  Even if prejudice were not required, the fourth prong of plain error review would preclude reversal of Defendant's convictions.

Although it is true that the right to be indicted by a grand jury on a federal charge is fundamental, it is not the sort of error which necessarily infects the trial.  One of the primary concerns underlying the right to indictment by a grand jury is the defendant's interest in notice of the charges against which he must defend.  See <u>United States v. Dubon-Otero</u>, 292 F.3d 1, 5 (1st Cir. 2002) ("A primary objective of the rule against constructive amendment of indictments is to ensure defendants have notice of the charges they must defend against."); <u>United States v. Folks</u>, 236 F.3d 384, 392 (7th Cir. 2001).  In some cases that concern is implicated.  For instance, in <u>Stirone</u> itself the defendant was convicted on a theory of the case not at all alleged in the indictment.  In this case, the theory and evidence presented by the government were not affected by the change in the charge.  As such, the interests of notice and ability to prepare a defense would not be sacrificed by failing to reverse in this case.  See <u>Reyes</u>, 102 F.3d at 1366 (refusing to reverse when constructive amendment did not affect the case presented by the government).

Defendant rightly voices the concern that the grand jury was intended to serve as a buffer between a federal prosecution and the defendant.  See Stirone, 361 U.S. at 217-19; Thomas, 274 F.3d at 670.  Despite its status as a fundamental enumerated right in the Constitution, the grand jury right has the unique status of having never been incorporated against the states by the Fourteenth Amendment.  Lanfranco v. Murray, 313 F.3d 112, 117 (2d Cir. 2002) (citing Branzburg v. Hayes, 408 U.S. 665, 668 n.25 (1972) (noting "indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment")).  In this case, an argument could be made that in allowing the jury to find that the defendant committed substantive murder through an aiding and abetting theory, rather than conspiracy to murder, Defendant was convicted of a crime more serious than that passed on by the grand jury.  Those concerns are not to be taken lightly.  They must, however, be balanced against the policies underlying the plain error rule and overall concerns of fairness in the individual case.  Given the evidence presented here and the case's procedural posture, a concern for fairness does not counsel reversal in this case.  As such, under the fourth prong of plain error analysis, I do not grant the motion for new trial because the error in this case did not "seriously affect[] the fairness, integrity or public reputation of judicial proceedings."  Olano, 507 U.S. at 736.

As a result, the motions for acquittal and new trial based on constructive amendment of the indictment are **DENIED**.  (Docket No. 1343.)

### 5.  <u>Other Counts</u>

Defendant argues that the mistake in charging Racketeering Act 20 constituted a constructive amendment of the other charges as well, because each of those counts relied in some way upon Racketeering Act 20.  Defendant does not argue that the counts were constructively amended per se; rather, on these counts, the jury was correctly charged on crimes for which Defendant was indicted.  Instead, Defendant argues that the charging error with respect to Count One tainted these convictions.

On Count Two, racketeering conspiracy, the jury was instructed that the government must prove three elements: (1) the existence of an enterprise engaged in interstate commerce; (2) the existence of a conspiracy to conduct and participate in the affairs of the enterprise through a pattern of racketeering activity; and (3) that the defendant intentionally joined that conspiracy and knew of and agreed to the overall criminal purpose of the RICO offense.  (Jury Instr. No. 25.)  Citing <u>United States v. Cianci</u>, 378 F.3d 71, 90 (1st Cir. 2004), the Court added:

> The government does not need to prove that a defendant himself committed or agreed to commit two predicate acts as required for the charge in Count One, although you may conclude that he agreed to participate in the conduct of the enterprise from proof that he agreed to commit or

> actually committed such acts.  On the other hand, you
> must find that the defendant under consideration was
> employed by or associated with the enterprise and agreed
> that at least two racketeering acts would be committed in
> the conduct of the affairs of the enterprise.  You must
> agree unanimously with respect to which two racketeering
> acts the defendant agreed would be committed after his
> joining the enterprise.

Defendant argues that because the jury only found that he

committed two racketeering acts, and that one of them was the

incorrectly charged substantive murder of Dinho Fernandes, the

RICO conspiracy conviction must be reversed.  However, as

instructed, Defendant's conviction on Count Two did not require

that he commit two racketeering acts, only that he agreed that

two racketeering acts would be committed in the conduct of the

enterprise.  Salinas v. United States, 522 U.S. 52, 64 (1997)

("The RICO conspiracy statute, § 1962(d), broadened conspiracy

coverage by omitting the requirement of an overt act; it did not,

at the same time, work the radical change of requiring the

Government to prove each conspirator agreed that he would be the

one to commit two predicate acts."); Cianci, 378 F.3d at 90;

United States v. Harriston, 329 F.3d 779, 785 (11th Cir. 2003)

("And regardless of how the government proves the agreement to

the overall objective, it does not necessarily have to show that

the defendant explicitly agreed with his co-conspirators to

commit the substantive RICO crimes as described in the

indictment.").

34

The jury was not asked which racketeering acts supported their conviction here.  Although it is possible one of the acts underlying this charge was the mis-instructed racketeering act, that was not necessarily the case.  The government's theory, for which there was ample evidence, was that upon joining the enterprise, Defendant adopted its objectives and began to commit acts on its behalf.  Although Defendant was arrested in fairly short order, the jury could have found that he had agreed to further the enterprise's common purposes.  (Trial Tr. 3:83-84 (Government witness Gus Lopes testified that Brandao started "coming down and helping us with shootings" and looking for Wendover members).)  Count Two was not constructively amended, and, as the Defendant was not prejudiced by the mis-instruction on Count One, see infra, the conviction on Count Two was not fatally tainted.

Defendant's claim with respect to his VICAR convictions is even more attenuated.  Defendant was convicted of Count Seventeen, Assault of Alcides Depina in Aid of Racketeering, and Count Eighteen, Use of a Firearm in Relation to a Crime of Violence, with respect the assault of Depina.  Again, Defendant does not argue that the jury was mis-instructed as to the elements of these offenses.  VICAR is different from RICO Conspiracy in that the government need not prove that the defendant agreed that two racketeering acts would be committed.

35

Rather, the government must prove that (1) an enterprise existed; (2) the enterprise affected interstate commerce; (3) the enterprise was engaged in racketeering activity; (4) the defendant was a member of the enterprise; (5) the defendant committed the alleged crime of violence; and (6) the defendant committed the crime in furtherance of his membership in the enterprise or because he knew it was expected of him by reason of his membership or for the purpose of maintaining his position in the enterprise.  Defendant suggests in a roundabout way that the mis-instruction with respect to Racketeering Act 20 irretrievably impacted the jury's perception Defendant's alleged membership in the enterprise.  However, as the jury was charged correctly on these counts, the jury specifically found that an enterprise existed and that Defendant was a member, and there was overwhelming evidence that Defendant committed the assault on Alcides Depina, not only was there no constructive amendment, but there is no colorable argument for reversal on the VICAR counts.

**B.  <u>Evidence of Lopes's Additional Conviction</u>**

Defendant moves for a new trial based on undisclosed evidence of a conviction of the government's cooperating witness Augusto Lopes.  Apparently, while in custody, Lopes assaulted three prison guards at the Barnstable House of Corrections and stabbed one of the guards numerous times with a pen.  Lopes was arraigned on February 16, 2005 on three counts of assault and

36

battery with a dangerous weapon, and he was sentenced on February 28, 2005 to a year in prison to run concurrently with his current sentence.  Lopes testified at Defendant's trial in January of 2006.  Although government counsel had provided defense counsel with Lopes's criminal record as of February 2004, he never followed up, and did not learn of this new conviction until April 14, 2006, three months after Defendant's conviction in this case. Although Defendant again asserts bad faith on the part of the prosecutor, there is no evidence to support it.

To mandate reversal, undisclosed impeachment evidence must be material.  Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005) ("Impeachment evidence must be material before its suppression justifies a new trial.").  "The suppression of impeachment evidence is 'material' when a reasonable probability exists 'that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.'" Id. (quoting Strickler v. Greene, 526 U.S. 263, 289 (1999)). Defendant suggests that the evidence is material because the additional conviction would serve to impeach Lopes's credibility. The government responds persuasively that defense counsel already had more than sufficient ammunition with which to attack Lopes' veracity, including a vast arrest record and conviction record for violent and drug crimes, his plea agreement, and his own testimony of a long history of dishonesty, cruelty, and lack of

respect for human life.  Viewed as just another criminal act on a
long list of egregious misdeeds, the evidence is cumulative and
not prejudicial.  See Moreno-Morales v. United States, 334 F.3d
140, 148 (1st Cir 2003) (noting that "'the unavailability of
cumulative evidence does not deprive the defendant of due
process'" (quoting United States v. Sanchez, 917 F.2d 607, 618
(1st Cir. 1990))); United States v. Dumas, 207 F.3d 11, 16 (1st
Cir. 2000).

Defendant's more potent argument, however, is that the
conviction is a violation of Lopes's plea agreement for which the
government did not punish him, meaning Lopes knew he could
violate his plea agreement and suffer no adverse consequences.
Defendant contends that the ability to argue this would undercut
the government's assertion that Lopes could be trusted because if
he lied that would breach the agreement, thus subjecting himself
to significantly higher penalties.  However, Defendant's argument
must still be viewed against the backdrop of Lopes's past record
of lying, which was fully brought to the jury's attention during
cross-examination.  Moreover, Defendant argued that Lopes had an
enormous incentive to lie by telling the government what it
wanted to hear.  The additional impeachment value of the new
conviction would not have been substantial.  Finally, Lopes's
story never changed from when he first proffered his testimony in
2002 and 2003 and when he testified at trial.  As nothing about

his testimony changed, it is difficult to see how the new variable of his knowledge that he could breach his plea agreement with impunity changed anything.

Defendant correctly points out that Lopes's testimony was crucial to the government's case.  However, significant evidence corroborated Lopes's accusations.  For instance, ballistics evidence corroborates Lopes' version of events and Brandao's statements to the police corroborated his involvement in the Fernandes murder.  With respect to the Depina shooting, the testimony of Det. James Smith and the discovery of the firearm in the car Brandao was driving corroborate Lopes's testimony.  See Conley, 415 F.3d at 189 ("Similarly, suppressed impeachment evidence has little probative value if additional evidence strongly corroborates the witness's testimony the suppressed evidence might have impeached.").

The additional evidence of the Barnstable convictions was not material and does not warrant a new trial.  As such, the motion is **DENIED**.   (Docket No. 1320.)

C.  **Sufficiency of the Evidence**

After review of the trial record, the Court finds that sufficient evidence exists to support the convictions.  Although Defendant deploys numerous attacks on sufficiency of the evidence, the only one I will address here is the question of whether Brandao was a member of the enterprise.  The jury

39

specially found that he was, and on a motion for acquittal, their verdict demands utmost deference.  Under Fed. R. Crim. P. 29(c), in assessing a motion for judgment of acquittal, "a court must determine 'whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.'"  Moran, 312 F.3d at 487 (quoting United States v. O'Brien, 14 F.3d 703, 706 (1st Cir 1994)).  So long as the guilty verdict "finds support in 'a plausible rendition of the record,' it must stand."  Moran, 312 F.3d at 487 (quoting United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)).

The Court finds that there was sufficient evidence to support that Defendant was a member of Stonehurst.  To begin, Lopes testified explicitly to that effect.  (Trial Tr. 4:115) Lopes also stated that he would drive with Brandao and other Stonehurst members looking for Wendover members to shoot.  (Trial Tr. 3:84-85.)  Lopes also testified that during the commission of the Fernandes murder, Brandao provided Monteiro with the 9 mm handgun he used to shoot Fernandes.  (Id. at 83.)  The frame of that gun was later found in Jackson Nascimento's apartment, and the barrel of the gun was found in a sewer where Lopes told police he had dropped it.

Although Depina was not a Wendover member, there was ample evidence supporting the jury's verdict that the shooting was linked to Stonehurst activities.  Defendant did the shooting with a Stonehurst gun with another Stonehurst member, Manny Lopes. Augusto Lopes testified that Brandao and Manny Lopes shot at Depina because he was the brother of Jimmy Gomes, who was on Wendover member David Andrade's side in a dispute.  (Id. at 104.) Although he was only a member of Stonehurst for a short period of time, on a Rule 29 motion, there is sufficient evidence in the record to support the jury's specific finding that he became a member of the enterprise at the time of Fernandes' murder.

### ORDER

Defendant's motions for acquittal and new trial are **DENIED**.

**S/PATTI B. SARIS**
United States District Judge